KEMPER (JONES v.). See Case No. 7,472.

KEMPF (HUS v.). See Cases Nos. 6,943 and 6,944.

## Case No. 7,689.

### In re KEMPNER.

[6 N. B. R. (1873) 521.] [1]

District Court, S. D. New York.

INVOLUNTARY BANKRUPTCY — FRAUDULENT TRANSFER OF ASSETS.

A debtor in failing circumstances attempted to make a compromise with his creditors of twenty-five per cent., but they rejected this offer and threatened him with proceedings in bankruptcy. At this time he represented that he had several promissory notes amounting to over nine hundred dollars. Some days after this a petition in bankruptcy was filed against him, and the order to show cause, together with the injunction served some two days later. The bankrupt swore that at the time of the service of the injunction he had sold the notes and spent most of the proceeds. Testimony was taken, and at the close, the register, to whom the proceedings had been referred, decided that an order should be entered directing the bankrupt within five days to hand over to said assignee the amount of the notes, with interest from the date of the adjudication, or in default thereof, an attachment issue against him as for a contempt, which order was duly approved by the judge.

[Cited in Re M'Kenna, 9 Fed. 29.]

By I. T. WILLIAMS, Register: I, the undersigned, register in charge of the above entitled matter, do hereby certify that since the filing of my last certificate I have been further attended by counsel for the respective parties, and have taken further evidence. which is hereto subjoined. And I further certify that in my judgment the case, as now presented, is one that calls upon the court to hold the bankrupt for the full value of the notes in question.

The facts are as follows: On Friday. the twenty-fourth day of March. eighteen hundred and seventy-one. the bankrupt called his creditors together with a view of effecting a compromise. He made a statement of his

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[1] [Reprinted by permission.]

debts and property, and proposed to pay his creditors twenty-five cents on a dollar of their respective claims in full satisfaction thereof. His creditors indignantly rejected the offer and threatened him with proceedings in bankruptcy. At this meeting he represented himself as being in possession, among other things, of six promissory notes, amounting in all to one hundred and twenty-three dollars, the proceeds of the sale of the stock in trade of his store in New Haven, which he sold out to his brother about a month before. This meeting was adjourned to the following day, Saturday, twenty-fifth of March. On that day others of his creditors attended, when he made the same statement, representing himself as still in possession of said notes, and urged the creditors to accept of the compromise he had offered on the previous day. These creditors also rejected the offer, expressed dissatisfaction, and threatened him with bankruptcy proceedings. These statements, as to what occurred on Saturday, are in great part denied by the bankrupt, although they are positively sworn to by five of the creditors. The petition against the bankrupt was filed on Saturday, the twenty-fifth, and an injunction was at the same time issued forbidding all interference with his property, which with the order to show cause was served on the bankrupt on Monday, the twenty-seventh. The bankrupt swears that at the time of the service of these papers, he had sold the notes in question, at a discount of ninety dollars, to one Henry Jacobs, and had spent all the proceeds of such sale, save about two hundred dollars. Under the circumstances of this case, I think the burden of showing that the notes or money for which they were sold, were not in the possession and under the control of the bankrupt at the time the assignee takes title, the time of the filing of the petition, and even up to the time of the service of the injunction and order to show cause upon him, is on the bankrupt and not on the assignee. On Friday he knew of his insolvency, and offers his creditors twenty-five cents on a dollar, in settlement of their claims. They refuse to take it, and threaten him with bankruptcy proceedings. It is true he denies that any such threat was made, but his denial cannot prevail against the positive testimony of the five witnesses to the contrary. If then, after that period, he places these notes beyond the reach of the assignee, with intent to do so, he commits a felony under the forty-fourth section of the act [of 1867 (14 Stat. 539)]. The law will not presume that such a felonious act was committed, but benevolently presumes the contrary. This presumption then must be overcome by evidence. The bankrupt fails to overcome it; without pausing to inquire whether a court will hear a party charge himself with a felony, the testimony taken together satisfies me that the bankrupt did not part with that money previous to the service of the order and injunc-

tion in bankruptcy. He was a man of small means and undoubtedly of economical habits; his rent was one hundred and sixteen dollars and sixty-six cents a month, but he underlet a part of his house, (for ninety-three dollars.) His business could not possibly have supplied him with the means of an affluent or even of a generous livelihood. He says of his business in answer to question thirty-four, "I did business on a very small scale." This is the reason he assigns for keeping no books, or what would seem, from his testimony, to be equivalent to none: and this was probably true, for he sold his New Haven store for one thousand four hundred dollars. The whole amount of his debts when he stopped business was only about eleven thousand or twelve thousand dollars, and his assets amounted to about two thousand seven hundred or three thousand dollars. They would pay nominally exactly thirty-two and one-half cents on a dollar of his debts, (see answer to question fifty-eight.) These notes comprised one-third of his assets, (really nearly all of them as the result shows;) that he should have got rid of this sum between Saturday afternoon and Monday, at the hour the order was served upon him, can be accounted for only upon the hypothesis that he was endeavoring to hide it in anticipation of such service, to keep it from his assignee. But that he should have used it in payment of debts, paying one hundred cents on a dollar, is contradicted by his whole course of conduct; a man who labors strenuously to obtain a compromise on Friday and Saturday by the payment of twenty-five cents on a dollar, and is expecting to succeed in this compromise up to the moment the bankruptcy papers are served upon him (fol. 72) would not be likely to use nearly all his available means during those few hours in paying one hundred cents on a dollar of his debts. He does not seem to have been very much pressed for money during the month previous, for he had received five hundred dollars cash upon the sale of the New Haven store. His account of the use to which he put that five hundred dollars is not very satisfactory. (See answer to question eight.) I can't think, therefore, that with this sum in his hands, his family expenses had, during that month, run far behind hand, if, indeed, he was so anxious to pay them as he would have us believe. But his attempt to account for the manner in which he disposed of the proceeds of those notes is even more unsatisfactory. In answer to the question (number twelve,) "What became of the cash?" he says, "I used it up for my family purposes, gas, rent, shoemakers and cutters. Question, (No. 13.) Can you give any statement of these amounts you paid? A. I cannot except a doctor's bill for about nineteen or twenty dollars; I don't remember; I have the bill I think" This testimony was given on the twenty-ninth of June, only three months after the events of which he was speaking, and

the bills of which he speaks, though repeatedly called for, have never been produced except two—the doctor's bill, (Exhibit B,) bearing date twenty-seventh of March, though it does not appear, on the face of the bill at least, when it was paid. But this bill is not produced till July twenty-eight, and then he says of it, (answer forty-seven,) "I got this bill from the doctor since the last examination." The other paper is a receipt for one hundred and sixteen dollars and sixty-seven cents, for the rent in advance of house No. 147 West Twenty-Fifth street (in which he did not then reside; fol. 67) for the month of May following. It appears by this receipt that this money was paid on the sixteenth of March, and there is nothing in the testimony to contradict it. The bankrupt's attention is called to it, and he says, (answer 46,) "This receipt for rent was made in my presence, most likely on the day it bears date." Clearly this rent was not paid from the proceeds of the sale of the notes, which sale took place more than ten days afterwards. This fact is finally acknowledged in his testimony of December eleven (fol. 86). "There is no further allusion to any payment for gas," and as to the "shoemakers and cutters," referred to in that answer, he says, in answer to the question (No. 24), "How much did you pay for shoemaker's bills?" "I don't remember." Question (25). "How much did you pay for cutter's bills?" Answer. "I don't remember." Question (26). "Do your books show what you paid for these two bills?" Answer. "I don't know; I suppose not." Notwithstanding this uncertainty as to the entries in his books, he seems to have been his own bookkeeper, for he says he kept none; and when further pressed as to what sums he had paid out of the proceeds of the sale of the notes for rent (question No. 27) he says, "I paid two months' rent at one hundred and sixteen dollars and sixty-six cents per month." Though at a subsequent sitting (fol. 67) he admits that he paid but one. At the next sitting his testimony is as follows: (fol. 32.) "I paid McCollum, I think his name is John; he lives at the Fifth Avenue Hotel; I can't tell when I paid him, but I know I paid him the rent, one hundred and sixteen dollars and sixty-six cents a month; I paid him for one month. I could not say whether it was Monday, Tuesday or Wednesday of the week after I got this money of Jacobs that I so paid him. This was for the rent of the house where I lived. This was in advance. This sum I paid him was for the rent of the house for the month next following the payment to him (April). But of this money I got of Jacobs I paid two months' rent, both times for a month in advance. Rent was payable on the first of the month. He always came after it to my house; I always paid him in advance; he is now paid up in full; I owe him nothing."

It is clear that this rent was not the rent referred to in the receipt, Exhibit A. For that was for the house he was to remove into on the first of May (fol. 67) and was in advance for that month and was paid to E. R. Roberts & Co., agents for Mary A. Nicholson. This was for the house he then lived in, (fol. 67.) These two months' rent were not paid at the same time, for he says, "both times were for a month in advance." * * * "I always paid him in advance," and hence could not have both been paid from the money received of Jacobs. If it was "always paid in advance," he paid the March rent in February, and as he left the house the first of May, there was but on month's (April) payable. But as he admits that he "could not say whether it was Monday, Tuesday or Wednesday of the week after I got this money of Jacobs that I so paid him," and as the order and injunction was served on Monday, it would not seem worth while to attempt to bring this payment within the subject of the present inquiry. But what would, in the absence of all the foregoing testimony, be conclusive on this subject, is the testimony of McCollum, taken by the assignee, on the eighteenth of December. His name is not "John" as the bankrupt suggested, but George W., and it would seem a little strange that the bankrupt should have been ignorant of the Christian name of his landlord, especially as "he always came after it (rent) to my house;" and it suggests the possibility that he did not desire to have him called. Yet, there can be no doubt of the man. Indeed the bankrupt does not suggest any doubt upon this point. McCollum testifies that the bankrupt owed him one hundred and sixteen dollars and sixty-seven cents on the first day of April, eighteen hundred and seventy-one, for rent of house 248 West Thirty-Sixth street. That on Tuesday, April six, he went to his store to collect it, found it had failed, and that other parties were in possession; bankrupt not there. He went to his house; found him out, called the next morning again, Friday, April seven; did not see him; went again Saturday evening following; found him in. He demanded the rent; Kempner replies that he had failed; had not a dollar in the world to pay him with, except what he had received from the tenants up stairs, which was about fifty dollars. But finally the bankrupt proposes that if one hundred dollars would be received in full he would try and borrow it; McCollum assents to this, and Kempner "went down stairs and brought up a gentleman who handed me one hundred dollars, and I gave a receipt for the month of April." The witness continues, "Since the twenty-fifth of March I have received no rent of Kempner except this one hundred dollars. The rent for the month of March I received on the first week, or in the first fifteen days of March." There is no attempt to contradict this witness, but if his statement is true, there is no escaping the conclusion that the bankrupt has committed the most wilful perjury; and this should on the

maxim "falsus in uno, falsus in omnibus," dispose of his whole property.

The allegation that the bankrupt paid out some part of the money in question to his shoemakers, or men called "teams," does not seem to be any better supported. It was for the services of these men for the week ending Saturday, March twenty-fifth, that these alleged payments were made. But it appears that his store or shop was taken possession of by the city marshal, and two men put in charge, on Monday of that week, (March twentieth.) It would not seem very probable that he continued his "teams" at work, in all respects as though nothing had occurred. He says (fol. 29) that his teams were in the habit of earning from two hundred to three hundred dollars a week; at two hundred and fifty dollars a week his disbursements for labor alone would be thirteen thousand dollars a year. This certainly does not tally with the accounts he gives of his business when excusing himself for not keeping books. In question (34) he says, "I did business on a very small scale;" nor yet does it tally with the state of his affairs when he attempted to compromise with his creditors; when his debts were eleven thousand or twelve thousand dollars, and his assets about two thousand seven hundred dollars. When he offers himself as a witness in his own behalf, and is examined by his own counsel, he asserts (fol. 65) that "on that Saturday (twenty-fifth) I paid out to shoemakers, cutters and employees about two hundred and fifty dollars; I think it was more." But when he is inquired of by the assignee's counsel how he ascertained the amount paid to the shoemakers? he answers (fol. 73), "More by belief than by knowledge; I know I paid them, and I know they worked through the week. I have not refreshed my memory by any entries or memorandum." But it would be difficult to believe that if his disbursements for labor were from two hundred to three hundred dollars a week, he kept no more satisfactory account of it on paper than some of his answers would indicate. Take the following for example: "I kept no cash book,. (fol. 13.) Q. In what did you make your cash entries? A. I made them loosely on pieces of paper. Q. Have you no statement now of the cash you received and paid out while you were in business? A. No, sir; I have not. Q. Do your books show any account of these transactions from the time you sold out the store to your brother? (fol. 17.) A. I don't know anything about it. Q. Can you refer to any entries in your books which will show a single payment to any of your creditors from this money? A. I don't know. Q. How much did you pay for your shoemaker's bills? (fol. 20.) A. I don't remember. Q. How much did you pay for cutter's bills? A. I don't remember. Q. Do your books show what you paid for these two bills? A. I don't know; I suppose not. Q. During that time. (the time he had carried on business in New York,) had

you no cash book? (fol. 23.) A. No more than I have stated; I might sometimes have marked down something, but nothing regular; I did business on a very small scale." Men who keep no books, but trust wholly to their memories, ought to have and generally do have very good memories. But this man is unable to assist the assignee to the means of contradicting him, by recalling to memory the names of one single one of his employees, either the servants of his family, to whom he swears he paid sixty or seventy dollars, (this amount would indicate that they had been sufficiently long in his family to have found out their names,) or the shoemakers, cutters, &c., who compose his teams. Pressed repeatedly on this point, he recalls the name of his cutter, "Meyer," (fol. 30;) has "no doubt that it is in the book where he lives, a book I kept for work," (fol. 31.) But this book the assignee is unable to get possession of. Yet the assignee finds this "Meyer," (he testifies as "Meyer Hecter,") and obtains his testimony, (fol. 95 and 96.) This man contradicts him flatly, as to working after the city marshal took possession. He asserts, (fol. 96) what is in keeping with every probability, that the city marshal took possession of his stock on Monday, March twentieth, and that Kempner paid him off in full (twenty-one dollars) the Saturday before. "I stopped working on the Monday after the marshal came in; he paid me nothing after this twenty-one dollars; I did no work, and went away after the marshal came in; Kempner discharged me at that time; there was no other cutter then; I was the only cutter; there was a stock fitter of the name of Schmidt; he left at the time I did." There was no attempt to contradict this man on the part of the bankrupt, by way of cross-examination or otherwise; nor was there any attempt to corroborate by him anything that had been previously asserted by the bankrupt concerning the continuance of the work after the marshal took possession. The fact. if it be one, (fol. 66) that he paid out of the money in question sixty or seventy dollars to his domestic servants, and forty dollars to the nurse who attended his wife in her last confinement, was not remembered by him when he testifies on the twenty-ninth of June, (fol. 16.) On the fifth day of July, however, he is able to say, "I have no doubt I paid my servant girl out of this money I got of Jacobs, I had no other money." But he only recalls the fact that he paid his domestic servants sixty or seventy dollars out of the money in question, when he is testifying in his own behalf, on the twenty-sixth of July. When asked, (June twenty-ninth,) "How much did you pay for servants' wages?" he answers, "I don't know, sir; my wife is sick and I can't keep things so closely as I did." Yet he swears that he gave none of this money to his wife, (fol. 22.) There does not seem to be any credible evidence that he parted with a shilling of the money he got from Jacobs, if

indeed he received any money from him, prior to the service of the orders in bankruptcy upon him. The whole case, with the evidence and surrounding circumstances, points unmistakably in my judgment to the conclusion that the bankrupt, failing to effect a compromise with his creditors, and having been by them threatened with proceedings in bankruptcy, if indeed such proceedings had not been already inaugurated, colluded with Jacobs to keep the notes in question from the assignee, and appropriate the same to his or their own use. The bankrupt, in his testimony, develops no such character as would make such a hypothesis improbable. For he is contradicted in almost every point upon which witnesses have spoken, in one by five witnesses. The character attributed to him by his creditors both at the meetings on the twenty-fourth and twenty-fifth of March, in promptly rejecting his offer of a compromise, and threatening him with bankruptcy, as well as by obtaining an injunction against such disposition of his property at the time of filing their petition, is also consistent with such a hypothesis. Merchants toward their brother merchants who are unfortunate, yet honest and fair, are almost uniformly not only just but generous. But, however little weight may be given to this, nothing can be claimed from these circumstances that tends to corroborate the bankrupt's statements.

Again, the testimony touching the sale of these notes is altogether unsatisfactory. It is proved by five witnesses, and must be accepted as the truth, that he stated at the meeting of the few creditors that came together on Saturday, that he still had these notes in his possession. His sworn statements, however, are as follows (fol. 26): "Q. When was the first time that you saw Mr. Jacobs about the sale of the notes to him? A. The day of the meeting of the creditors, Friday, twenty-fourth of March. Q. Where did you see him; was it at his house? A. Yes, we were neighbors and I saw him Friday afternoon on the day of the meeting, or rather in the evening. I showed him the notes; but I am not sure that I had the notes in my pocket when I called at his house. I think I handed him the notes the next morning. I handed him the notes the next morning at his house and he handed me the money. I believe he gave me some part of the money in checks and some in bills — on reflection he paid me all money. He told me to wait a little while and he went out and got the money. This was all the examination he made of the notes. He said, 'Mr. Kempner, I don't know your brother, but if you say the notes are good I will take them.' I did not indorse them. * * * This was Saturday morning; I keep Saturday as the Sabbath." This is his recollection of an important occurrence that took place but three months before. He called Friday afternoon—no it was Friday evening. He showed him the notes—no he is not sure that he had them

in his pocket. He gave me some part of the money in checks and some in bills—no he paid me all money. Truth does not report itself with such uncertainty. Jacobs (at fol. 58) gives his narrative. Kempner represented himself as "very hard pressed." He had never seen the maker of the notes, yet he takes them without inquiry or endorsement, and pays down their face in cash less ninety dollars. He thinks it was all done in twenty-four hours. He thinks he had the notes over night. He does not generally do business on Saturdays, but he paid for these notes on that day (he can't say whether before or after sundown) as soon as he came, from money he had in the house (he had sold some stocks that day.) Afterwards he thinks it may have been somewhere about noon that he handed him the money; he had been away from his house —somewhere in Eight avenue that morning— before he paid him the money. In this short narrative he differs from Kempner in several particulars. Kempner says, "He told me to wait a little while, and he went out and got the money." Jacobs says, 'I had the money in the house; I had sold some stocks that day and had the money in the house; I am positive of that. The next day as soon as he came I gave him the money." Kempner says, "I am not sure that I had the notes in my pocket when I called at his house, (Friday,) I think I handed him the notes the next morning—I handed him the notes the next morning." Jacobs says, "He gave me the notes on Friday afternoon—I am most sure it was on Friday I had the notes in my possession. I think I had them over night." It is scarcely possible that this man, who spoke of the bankrupt as "merely a friend of mine," was ignorant of his true condition, and that under those circumstances he would have advanced eight hundred and fifty dollars or thereabouts, at one time, upon security of which he was utterly ignorant, for the mere chance of making ninety dollars.

I regard the bankrupt as utterly discredited, and, although it may seem a harsh remedy to order him to hand over that money, yet it is the mildest of the three remedies to which the assignee may obviously have recourse. I therefore recommend that an order be entered directing said bankrupt, within five days, to hand over to said assignee the sum of nine hundred and twenty-three dollars and interest thereon, since the twenty-fifth day of March, eighteen hundred and seventy-one, and the costs of these proceedings to be adjusted by the register in charge, or that an attachment issue against him as for a contempt.

BLATCHFORD, District Judge. Let an order be entered in conformity to the register's certificate.